[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On August 7, 2001 and July 17, 2001, respectively, the petitioner, the Commissioner of the Department of Children and Families (DCF), filed petitions pursuant to C.G.S. § 17a-112, et seq. to terminate the parental rights of Daisy C. as to two of her children, Elsa F. and Victor C. Petitioner also sought to terminate the parental rights of Edwin R., father of Elsa, and Robinson G., father of Victor. Respondent fathers Edwin R. and Robinson C. did not appear for trial. Trial of this matter took place before this court on March 12 and 26, 2002 at the Regional Child Protection Session at the Middlesex J.D. For the reasons stated CT Page 8365 below, the court finds in favor of the petitioner.
The statutory grounds alleged against respondent mother Daisy C. as to both Elsa and Victor were that the children were found in a prior proceeding to have been neglected or uncared for and the mother had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and needs of the children, she could assume a responsible position in the lives of the children (C.G.S. § 17a-112 (j)(3)(B)(i)). As to Elsa, petitioner also alleged that the child had been denied, by reason of an act or acts of commission or omission, including but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, by the respondent mother the care, guidance or control necessary for her physical, educational, moral or emotional well being. (C.G.S. 17a-112 (j)(3)(C)). As to respondent father Edwin R., petitioner alleged that (1) the child Elsa has been abandoned by Edwin R. (C.G.S. § 17a-112 (j)(3)(A)) and; (2) that there is no-ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112
(j)(3)(D)).
As to respondent father Robinson G., petitioner alleged (1) that the child Victor C. has been abandoned by Robinson G. (C.G.S. § 17a-112
(j)(3)(A)); (2) that his child, Victor C. was found in a prior proceeding to have been neglected or uncared for and the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and needs of the child, he could assume a responsible position in the life of the child (C.G.S. § 17a-112 (j)(3)(B)(i)); and (3) that there is no-ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112 (j)(3)(D)).
The court finds that notice of this proceeding has been provided in accordance with the provisions of the Practice Book. The court further finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the children.
"The termination of parental rights is defined as the complete CT Page 8366 severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent. . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. § 17a-112. In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z., 26 Conn. App. 58, 63 597 A.2d 842 (1991), cert. denied, 221 Conn. 901 (1992); In re Teresa S., 196 Conn. 18
(1985); Practice Book 33-1, et seq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC),194 Conn. 252, 258 (1984); In re Karrlo K., 44 Conn. Sup. 101, 106
(1994), aff'd, 40 Conn. App. 73 (1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal, (84-AB), 192 Conn. 254, 264 (1984). "Pursuant to Practice Book § 33-3(a), in deciding the adjudicatory phase of the hearing for the termination of parental rights, the trial court's inquiry is limited to the events and facts preceding the filing of the petition for the termination of parental rights." In re Daniel C., 63 Conn. App. 339, 357
(2001). However, "[i]n the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether thedegree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." In reStanley D., 61 Conn. App. 224, 230, 763 A.2d 83 (2000) (emphasis in original); see In re Latifa K., 67 Conn. App. 742, 748, 789 A.2d 1024
(2002).
If at least one pleaded ground to terminate is found, the court proceeds to the disposition stage. The court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. In re Eden F., 250 Conn. 674, 688-89,741 A.2d 873 (1999); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258, CT Page 8367479 A.2d 1204 (1984); State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Quanitra M., 60 Conn. App. 96, 102,758 A.2d 863, cert. denied, 255 Conn. 903 (2000); In re Nicolina T.,9 Conn. App. 598, 602, 520 A.2d 639 cert. denied, 203 Conn. 804,525 A.2d 519 (1987); In re Emmanuel M., 43 Conn. Sup. 108, 113,648 A.2d 904, aff'd, 35 Conn. App. 276, 278, 648 A.2d 881, cert. denied,231 Conn. 915, 648 A.2d 151 (1994).
I. FACTS
Witnesses at trial included DCF social workers Linda DiVito, Eileen Geary, and Kelly White, the foster mother and Julia Ramos Grenier, Ph.D. Respondent mother Daisy C. and Juan M. testified on behalf of respondent mother. The Court has considered the documentary evidence as well as the testimony of the witnesses. The credible evidence admitted at trial supports the following facts by clear and convincing evidence.
Elsa was born on September 1996 to Daisy C. following a brief relationship with Edwin R. Elsa's half-brother, Victor C. was born May 1999 after a brief relationship with Robinson G. A third child was born to Daisy C. and Juan M., with whom she currently resides, on July 8, 2001. This child is not a subject of the pending petitions.
Respondent mother first came to DCF's attention in December, 1996 when she was 18 and Elsa was only a few months old. At that time, police responded to an argument between respondent mother and her sister. DCF opened a case and referred mother to a parent aide program and the Community Health Center in Meriden. The case was closed in February, 1997 when mother moved to Pennsylvania.
The family again came to DCF's attention on October 12, 1999, when DCF received a referral from Saint Mary's Hospital in Waterbury alleging that mother was verbally and physically abusive to Elsa when mother brought Elsa and Victor to the emergency room because Victor was in need of asthma treatment. Patients and ER staff heard respondent mother threaten to "break Elsa's face" and that she was "going to kill [her] when they got home" and they heard mother call Elsa a whore in Spanish. Respondent mother was rough with Elsa, spun her around and slapped her face and hand. Three year old Elsa was observed to have a bruise on her face and rotten teeth. She was very dirty and unkempt. Respondent mother was arrested. and the children were kept overnight for observation. The children were returned to mother with services in place including a referral to Connecticut Counseling for substance abuse evaluation and treatment, VNA in-home services to assist with Victor's asthma, and a parent aide.[1] The substance abuse evaluation and testing was positive for marijuana use and treatment was recommended. Respondent mother also CT Page 8368 tested positive for cocaine on December 1 7, 1999.
DCF made a visit to respondent mother's apartment October 12, 1999, the day it received the referral from Saint Mary's Hospital. The social worker found deplorable conditions in the home. The apartment was without heat and electricity and there was no crib for Victor who was then five months old. There were roaches and mice in the apartment. Respondent mother had recently moved there from a shelter in Meriden, and told the social worker she had not reapplied for benefits through the Department of Social Services or the Women, Infants and Children program since returning to Waterbury.
The same social worker made an unannounced visit to the apartment three days later on October 15. At this visit, the worker found that the home continued to be disorganized, filthy and unsafe. Elsa was dirty and unkempt, and respondent mother had poor hygiene. Elsa was jumping on a mattress on the floor and banging her head against the wall. Respondent mother made no effort to redirect the child.
On October 21, Saint Mary's Childrens Health Center reported to DCF that respondent failed to bring Elsa in for a scheduled follow-up medical appointment and that both Elsa and Victor were behind on their immunizations.
On October 27, 1999 an in-home worker from New Beginnings reported that during the visit that day, respondent mother had been very negative toward Elsa calling her "bad" and telling her to "get away from me." Elsa was observed to have a faded bruise on her face. When the worker discussed mother's behavior and that she could lose custody of her children, respondent stated that she "didn't care." Although this visit occurred over two weeks after DCF's initial visit, the conditions in the home continued to be "deplorable with garbage and clothing on the floor, urine odor throughout, dirty mattresses on the floor with no sheets, exposed wires, general filth, heater without cover panel, still no electricity, roaches, mice and a broken refrigerator." Exhibit B. When asked about the conditions in the home, respondent mother said that the house was dirty because her daughter made a mess.
In early November 1999, neglect petitions were filed by DCF with regard to Elsa and Victor. Social worker DiVito testified regarding her involvement with the case from October 25, 1 999 through July, 2000. Ms. DiVito made an unannounced visit in early November, 1999 at which she found respondent mother and her new boyfriend Nelson T., sitting on two twin mattresses on the floor. The apartment continued to be filthy, with cockroaches everywhere and bags of garbage and clothing on the floor. The odor from respondent's poor hygiene and bad breath made the worker CT Page 8369 physically sick to her stomach. The worker explained to respondent that she needed to clean up and straighten the house. Ms. DiVito went back a few days later and the conditions had not improved. The apartment continued to be roach-infested, with dead roaches even inside the refrigerator. There was no formula for the baby who was approximately six months old. The worker observed a bruise on Elsa's cheek. A few days later, the worker visited again and found that respondent mother had cleaned up a little and had done some organizing, although there were still so many roaches that the worker did not want to walk through the doorway for fear that the roaches would fall on her. The next visit took place on December 7, 1999 at which time both DCF worker DiVito and the attorney for the children together visited the apartment. During this visit, the children's attorney informed respondent mother that they had to look in the refrigerator for food. Respondent then took out a butcher knife and while talking to the worker and the attorney, waved the knife around and acted as though she were slicing her hand, though she did not actually cut herself.
The next day, December 8, 1999, respondent mother appeared in court in connection with the neglect petition. Following the hearing on the neglect petition, a bench Order of Temporary Custody (OTC) was issued by the court (Lopez, J.) and both children were removed from their mother's care on December 8, 1999. Specific steps to facilitate reunification were issued by the court on the same date. At that time, a psychiatric evaluation was ordered based on mother's presentation and lack of affect in the courtroom. The DCF worker took respondent mother for the evaluation after which mother was diagnosed with major depression and placed on medication. At two subsequent home visits, DCF worker DiVito had trouble waking respondent mother and was successful only after several minutes of knocking. When Ms. DiVito transferred the case to another worker in July, 2000, respondent mother had been evicted from her apartment for failure to pay rent, she was not working and DSS discontinued her benefits because it was unaware of her whereabouts. At mother's request, Ms. DiVito assisted her in her efforts to get her benefits restored.
On February 16, 2000, Elsa and Victor were adjudicated neglected on the grounds that they were denied proper care and attention, physically, educationally, emotionally or morally, and that they were permitted to live under conditions, circumstances or associations injurious to their well being. (Moore, J.) On April 5, 2001 the court found that it was not appropriate to continue to make reasonable efforts to reunify Elsa and Victor with their fathers. (Dewey, J.) On February 6, 2002, the court found that reasonable efforts to reunify the children with their mother were no longer appropriate. (Reynolds, J.) CT Page 8370
After the OTC issued on December 8, 1999, Elsa was taken to a DCF safe home. The safe home reported that she was being treated for head lice. After seeing a pediatrician, Elsa was referred to Danbury Hospital ER for an x-ray of her arm because she was complaining of pain and favoring her arm. The x-ray revealed a fresh break to the humerus, most likely resulting from a twist or a fall. Previously, mother had informed a social worker that she had taken Elsa to the ER in Waterbury on December 6, 1 999, but they sent her home. On December 7, mother took Elsa back to the hospital, but again was sent home with a diagnosis of joint pain.
When Elsa was placed in DCF care, she was showing signs of having been sexually abused. She was acting in a sexually inappropriate manner for a three year old child, including masturbating, gyrating, touching herself in a sexual manner, and making sexually explicit and inappropriate comments. While engaging in this conduct, she was saying "Popi", which may have been a reference to an adult male who had been a boyfriend of respondent mother's, Nelson T. Although a medical examination was undertaken, sexual abuse could be neither ruled out nor confirmed because of a lack of physical findings, Elsa's age and her developmental and language delays. Her oppositional and sexualized behaviors increased after she started school full time in September 2001 and during an attempted transition to a preadoptive home.
Elsa received individual therapy for many months and was diagnosed with Post Traumatic Stress Disorder and Adjustment Disorder, anxiety and depression. She progressed substantially gaining emotional stability with a decrease in the behaviors of concern.
Educationally, Elsa had minimal academic growth in kindergarten during the last school year and was being evaluated as to whether to repeat kindergarten for next year. Elsa does not ask to visit with her mother, although she has inquired at visits when they would be going home.
Victor has been diagnosed with chronic asthma, which he has had since birth. He is considered a medically fragile child and requires consistent medical management and routine monitoring by a specialist to control his asthma. While initially requiring nebulizer treatments four times a day, those treatments were gradually reduced and are now needed once a day. Victor received in-home Birth to Three services once a week from November 2000 through November 2001. These services were discontinued with Victor showing age-appropriate skills in all areas of development. Victor is a happy, good-natured and playful child.
Elsa and Victor's foster mother testified credibly concerning the children's adjustment to her home. When Elsa and Victor first arrived, Elsa was underweight, nervous and withdrawn and a number of her teeth CT Page 8371 were rotten. She was in a lot of pain from her rotten teeth and cried when she tried to eat. Elsa was acting out sexually and drew male parts on stick figures at age three and four. After joining the foster family, Elsa had four rotten teeth extracted and gained weight. Elsa and Victor have been living together in this loving and supportive foster home since January 2000. This home is meeting all of their routine and specialized needs. Victor and Elsa share a room and have maintained a strong sibling bond. Neither Elsa nor Victor ask for or talk about respondent mother. The foster family has gone to great lengths to provide the care the children need.
Visitation
The children have had supervised visitation with respondent mother once a week at the Waterbury DCF office. Respondent mother has routinely brought snacks and toys to the visits. The clear and convincing evidence reveals that mother has not demonstrated consistent parenting skills during the visits. She has yelled at the children for age-appropriate behaviors and has expressed anger and impatience toward them, at times yelling to extreme. She has made negative comments about the foster home to the children and has been negative toward the children, telling them their haircuts were ugly. She has made inappropriate comments to them, calling Elsa "sexy baby." On a number of occasions, mother did not interact with the children, or initiate play or activities with the children, but sat in a chair and watched them play. She has often ignored one or the other of the children at the visits, on some occasions telling Victor to play by himself and failing to attend to Victor's needs, and on others giving Victor attention while ignoring Elsa. On one occasion, when Victor needed a diaper change toward the end of a visit, mother did not change him, laughed and left. Mother has not developed a meaningful parental relationship with Victor who was removed from her care at the approximate age of six months.
Respondent Mother
Respondent mother was born March 19, 1978. She was removed from her mother's home at the age of six and placed in foster care. She has two brothers and one half-sister. Her mother was unable to care for her and her siblings due to drug use. Her mother was not employed and the major source of income was welfare payments. She has no contact whatsoever with her father who had a history of alcohol abuse and left home when she was one year old. Her mother has continued to use drugs. While in foster care, beginning at the age of 8 or 9, and continuing until she was 14, respondent mother was sexually molested by a male child in the foster home. She ultimately brought it to the attention of her therapist and social worker and she was placed in a different home. She dropped out of CT Page 8372 high school in the 1 0h grade. At the age of 18, she was pregnant and had nowhere to live, so she moved to Connecticut to live with her sister.
Respondent mother's employment history has been sparse with some work as a temporary employee and some factory work for a limited time. She is attending school in the evenings to attempt to earn her GED. Mostly she has been on assistance and has lived a transient lifestyle. Respondent mother testified that she had been diagnosed with major depression through Waterbury Behavioral Health. After a few months of group therapy, she stopped attending because she had no transportation. She also testified that she did not have medical coverage. She was taking medication for a while, but stopped when she became pregnant with Juan, Jr. She admitted that she never completed a program of individual counseling or family counseling. Respondent mother denies any need for further mental health counseling and treatment and declined any assistance in this regard from DCF.
Respondent mother conceded that Elsa could have been sexually molested when she lived with a boyfriend, Nelson T., in late 1999. She has never been married, but has lived with Juan M., the father of her third child, for over a year. Daisy C. loves Elsa and Victor and seeks to have them returned to her and Juan M. She believes that she can care for them.
The specific steps issued by the court on February 16, 2000 to facilitate reunification required that respondent mother keep all appointments set by or with DCF, cooperate with DCF home visits, announced or unannounced, and visits by the child's court appointed attorney and/or guardian ad litem; keep children's whereabouts and your own whereabouts known to DCF, your attorney and the attorney for the children; participate in counseling and make progress toward the identified treatment goals including parenting, individual and family counseling; accept and cooperate with in-home support services referred by DCF and make progress toward the identified goals; submit to substance abuse assessment and follow recommendations regarding treatment; successfully complete substance abuse treatment including in-patient treatment if necessary and follow recommendations regarding after care treatment, including relapse prevention; submit to random drug testing; time and method of testing shall be at the discretion of DCF; follow recommendations of service providers including Family Services and Waterbury Behavioral Health; sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for future use in proceedings before the court; secure and/or maintain adequate housing and legal income; no substance abuse; no involvement/further involvement with the criminal justice system; cooperate with the Office of Adult Probation or parole officer and comply with conditions of probation or parole; immediately CT Page 8373 advise DCF of any changes in the composition of the household to insure that the change does not compromise the health and safety of the children; maintain the children in the State of Connecticut; the children may travel outside the State of Connecticut only if respondent obtains authorization from DCF or the Court in advance.
In terms of compliance with these steps, respondent mother's contact with DCF has been minimal. Mother completed parenting classes at Family Ties and Family Services. While respondent mother had good attendance and completed the classes, she clearly has not shown retention of information and has not demonstrated strengthened parenting skills in visitation. Mother cooperated with psychological testing, but has not engaged in recommended treatment services offered to address depression and substance abuse. She was formally discharged from Saint Mary's Hospital, Behavioral Health Institute, Marian Center, on August 9, 2001, having voluntarily withdrawn August 16, 2000. According to the discharge summary, respondent had telephoned the program August 16, 2000 stating she did not want to return. Exhibit G. At the time of discharge, she was unemployed and living with a friend. Her diagnoses at discharge were major depression with psychotic features and cannabis dependence in remission. She was prescribed an antidepressant, Celexa. Mother has not completed a program of individual or family counseling. Thus, although respondent has complied with some of the specific steps, she has not complied with all of them.
Respondent Father of Elsa — Edwin R.
Respondent father Edwin R. was born December 30, 1976. He took no responsibility whatsoever when he was informed that Daisy C. was pregnant. Respondent mother really had no relationship with Edwin who, according to respondent mother, "didn't want a girlfriend." Edwin R. has not taken any responsibility for Elsa. Specific steps to further reunification were issued February 16, 2000, but Edwin R. did not comply with them. He has never contacted DCF to request visitation or inquire as to Elsa's well being. He has never provided any financial support or emotional support of any kind and has not sent cards, letters or gifts. Elsa does not know him and has no memories whatsoever of him. He was not around when she was born and he has not been a part of her life. He has not inquired as to Elsa's well-being and is unaware of her special needs. On April 5, 2001 the court found that it was not appropriate to continue to make reasonable efforts to reunify Elsa with her father. He did not appear for trial.
Respondent Father of Victor — Robinson G.
Victor was the product of a short-term relationship between Daisy C. CT Page 8374 and Robinson G. lasting about two months. Respondent father of Victor, Robinson G., has not taken any responsibility for his son. Specific steps to further reunification were issued February 16, 2000, but Robinson G. has not complied with them. Respondent father has never contacted DCF inquire about his son's well being or to seek visitation. He has never provided any financial support or emotional support of any kind and has not sent cards, letters or gifts. Victor does not know Robinson G. and has no memories whatsoever of him. He was not around when Victor was born and he has never been a part of his life. He has not inquired as to Victor's well-being and is unaware of his special needs. On April 5, 2001 the court found that it was not appropriate to continue to make reasonable efforts to reunify Victor with his father. Robinson C. has not appeared in the case and did not appear for trial.
Psychological Evaluation
In December, 2001, Julia Ramos Grenier, Ph.D., performed a psychological evaluation of respondent mother and an interactional evaluation with respondent mother and the two children.
Dr. Ramos Grenier's intellectual assessment showed that although respondent mother's Full Scale IQ of 74 was in the Borderline Range, language differences may have accounted for some of the discrepancy between verbal and other scores and, as a result, Ramos Grenier concluded that respondent was more accurately viewed in the Low Average Range than the Borderline Range. The validity scales of the MMPI showed that mother was trying to present herself as better than she really is or that she was "faking good." The evaluation revealed that respondent mother, who had a seven year history of marijuana use, continued to use marijuana from time to time. Respondent mother did not see her marijuana use as a problem and was not trying to stop. Dr. Ramos Grenier found respondent mother to be suffering from situational depression, but not clinical or chronic depression. She testified that respondent requires individual therapy to address issues of being over-sensitive and withdrawal from and an inability to trust other people. These issues negatively impact on respondent's ability to form good, stable relationships with others. With regard to personal rehabilitation and recovery, she found that respondent mother needed to continue therapy, particularly to address her long term history of substance abuse and emotional difficulties.
With regard to mother's interaction with Elsa and Victor, Dr. Ramos Grenier found a very positive interaction. During the evaluation, mother was appropriate with them and remained interested in them and what they were doing and her level of interaction was developmentally appropriate. Despite the positive interaction on this occasion, Dr. Ramos Grenier found that respondent's underlying substance abuse and emotional issues CT Page 8375 (which mother had failed to address in therapy) had a negative impact on her parenting and expressed her belief that respondent mother was not able to instill trust and stability in the children. Dr. Ramos Grenier testified credibly that Elsa does not trust respondent mother and that mistrust in the relationship has already been conveyed and established. With regard to Victor, he has had much less exposure to mother on a regular basis. The children both had positive feelings toward mother and were receptive to mother's affections, but did not initiate affection toward her. Dr. Ramos Grenier found that both children addressed their mother as "Mommy" and that Elsa voiced the fact that she loves her mother. Dr. Ramos Grenier concluded that both children see respondent mother as an important parental figure, but that Elsa "appears to lack trust in [respondent mother's] permanency in her life, and the bond between Victor and his mother, while friendly, appears to be quite weak." Exhibit H at 4.
Dr. Ramos Grenier's primary concern was that respondent mother had not addressed substance abuse and mental health issues. She therefore viewed respondent mother as an individual at risk for future difficulties. She was concerned that although mother admitted to marijuana use for seven years on and off, respondent mother had not acknowledged that drug use has been a problem in her life or the negative impact it had on her children and her relationship with them. Dr. Ramos Grenier acknowledged that a period of sobriety was important, but that relapse was possible and that it was important to have support. Changes in circumstances, even after periods of sobriety, can lead to relapse. Dr. Ramos Grenier noted that respondent mother indicated as her only support system, her current partner with whom she had lived for a year, and a female friend. Dr. Ramos Grenier opined that she could not recommend return of the children to mother since mother had not acknowledged her substance abuse problem and had not taken steps to address her emotional difficulties. She found that mother was not able to rehabilitate in a reasonable period of time in order to establish a responsible position in the lives of the children. Dr. Ramos Grenier concluded that severing parental ties would be beneficial in the long run for both children.
Juan M. testified on respondent mother's behalf. The court finds that he is supportive of mother emotionally and financially, although he is currently separated from someone else, and has a 5 year old daughter. He works full time. He has a child with respondent. Although he has indicated a willingness to have respondent mother's two other children live with them, he is unaware of the extent of the particular needs of these two children.
II. ADJUDICATION
CT Page 8376
Each statutory basis set out in General Statutes Section § 17a-112
(j) is an independent ground for termination. The petitioner is required to prove one or more of the grounds alleged in its petition by clear and convincing evidence. In re Baby Girl B., 224 Conn. 263, 618 A.2d 1
(1992).
A. Location and Reunification § 17a-112 (i)(1):
In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." C.G.S. § 17a-112 (j)(1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted; citation omitted.) In re Mariah S.,61 Conn. App. 248, 255, 763 A.2d 71 (2000).
On April 5, 2001 the court found that it was not appropriate to continue to make reasonable efforts to reunify Elsa and Victor with their fathers. On February 6, 2002, the court found by clear and convincing evidence that reasonable efforts to reunify the children with their mother were no longer appropriate. (Reynolds, J.) Under the statute, a finding that reasonable efforts were made is not required if the court has determined, as in this case, that reasonable efforts are no longer appropriate. 17 C.G.S. § 112(j)(1); In re Gary B., 66 Conn. App. 286,290-91, 784 A.2d 412 (2001).
Additionally, the Court finds by clear and convincing evidence it has been proved that respondent mother and both respondent fathers are unable or unwilling to benefit from reunification efforts. By virtue of the respondent fathers' complete noninvolvement with their children, and considering the emotional needs of these children, the respondent fathers are unable to benefit from reunification efforts.
As to respondent mother, reunification efforts have been ongoing continuously since December, 1 999. Mother has been provided with regular visitation and has been referred to numerous service providers. She demonstrated that she was unable or unwilling to benefit from reunification efforts.
B. Abandonment: C.G.S. § 17a-112 (i)(3)(A)
CT Page 8377
Petitioner has alleged as to both respondent fathers Edwin R. and Robinson G. that they have abandoned Elsa and Victor, respectively.
"Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. Inre Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801
(1981)." In re Kezia M., 33 Conn. App. 12, 18, 632 A.2d 1122, cert. denied, 228 Conn. 915 (1993); In re Terrance C., 58 Conn. App. 389, 394
(2000). This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. In re Roshawn R., 51 Conn. App. at 53. Indicia of interest, concern and responsibility include "attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support." In re Drew R., 47 Conn. App. 124, 129 702 A.2d 647
(1997). The test for determining abandonment of a child for purposes of termination of parental rights cases is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern or responsibility as to the child's welfare. In re Rayna M., 13 Conn. App., 23, 36,534 A.2d 897 (1987).
These children were the product of extremely short-term relationships between mother and men who did not want to enter into any significant relationship with her and who took absolutely no responsibility for their children. Neither respondent father ever took advantage of visitation services, and neither Elsa nor Victor has ever met their father. See Inre Deana E., et al., 61 Conn. App. at 185. Neither respondent father ever sent any cards, letters or gifts to or for their child and did not call DCF to inquire about their child's well-being.
Respondent fathers have made no effort at any time to contact their children. They have not maintained any interest in their children, let alone a reasonable degree of interest, concern or responsibility for the welfare of their children. The court therefore concludes that this ground has been established by clear and convincing evidence as to each respondent father.
C. Failure to Rehabilitate — § 17a-112 (i)(3)(B)(i)
The Court finds that the petitioner has established by clear and convincing evidence that respondent mother Daisy C. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and special CT Page 8378 needs of the children, she could assume a responsible position in the lives of her children, who were adjudicated neglected on February 16, 2000.
"`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court . . . to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that [within a reasonable time] she can assume a responsible position in her child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In reShyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)]." In re SarahAnn K., 57 Conn. App. 441, 448, 749 A.2d 77 (2000). See also In re AshleyS., 61 Conn. App. 658, 665, 769 A.2d 718, cert. denied, 255 Conn. 950
(2001); In re Amneris P., 66 Conn. App. 377, 384-85, 784 A.2d 457
(2000).
The court finds by clear and convincing evidence that respondent has not achieved a sufficient degree of rehabilitation as would encourage the belief that within a reasonable time, considering the ages and special needs of the children, she could assume a responsible position in Elsa and Victor's lives. See In re Daniel C., 63 Conn. App. 354; In re AshleyS., 61 Conn. App. at 665; In re Sarah Ann K., 57 Conn. App. at 448. "The psychological testimony from professionals is rightly accorded great weight in termination proceedings." (Internal quotation marks and citation omitted.) In re John C., 56 Conn. App. 12, 24, 740 A.2d 496
(1999). The psychological evidence in this case clearly establishes that respondent mother has not achieved § 17a-112 (j)(3)(B) rehabilitation. Dr. Ramos Grenier was unequivocal in her opinion that respondent could not provide day to day care for Elsa and Victor. She testified credibly that respondent mother could not instill trust in the relationship with her children. She testified credibly that respondent mother's inability to acknowledge and address her substance abuse and emotional difficulties made her unable to assume a responsible position in the lives of Elsa and Victor with their complex problems and special needs. Indeed, respondent mother was discharged from a dual diagnosis program, designed to address these very issues, as a result of her own voluntary withdrawal and lack of attendance. Moreover, as of the adjudicatory dates, mother had not completed individual or family counseling, and had not maintained employment. She had attended parenting classes, but did not demonstrate improved parenting skills in CT Page 8379 visitation. She had been living for only a few months with a boyfriend who was paying the rent.
The court concludes by clear and convincing evidence, that as of the adjudicatory dates of July 17, 2001 as to Victor and August 7, 2001 as to Elsa, respondent had not brought herself into a position in which she could provide adequate care for Victor and Elsa. The court must also consider whether events after the adjudicatory date establish "a degree of rehabilitation that is sufficient to foresee that [respondent mother] may resume a useful role in the child's life within a reasonable time."In re Stanley D., 61 Conn. App. 223, 230, 763 A.2d 83 (2000); In reLatifa K., 67 Conn. App. at 749-50 (acknowledging that the court could take facts into account from beyond the adjudicatory period in making its decision in the adjudicatory phase with regard to whether the degree of rehabilitation was sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time.) By the time of trial, respondent mother had obtained more stable housing since she had resided with Juan M. for a more extended period of time. She was also taking classes toward her GED and worked more regularly. Even considering these events, however, respondent mother was still not in a position to assume a useful role in the lives of her children within a reasonable time in view of their special needs. The court also considers respondent mother's risk of relapse due to her inability to acknowledge the impact of her marijuana use on her children as testified to by Dr. Ramos Grenier and the fact that mother left mental health treatment without being discharged. Respondent mother herself conceded that she had not completed individual or family counseling.
Rehabilitation must be foreseeable within a reasonable time. In reSheila J., 62 Conn. App. 470, 479-80, 771 A.2d 244 (2001). "What constitutes a reasonable time is a factual determination that must be made on a case-by-case basis." In re Stanley D., 61 Conn. App. at 231
(quoting In re Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000). Here, for two children who have not lived with their mother in over 2 1/2 years, the time necessary for sufficient rehabilitation even under the best of circumstances is not reasonable. Victor and Elsa now have the stability of a wonderful foster home together. Although their foster mother is not in a position to adopt them, she remains committed to them. And in this case, rehabilitation itself remains speculative and contingent on respondent mother's ability to remain drug free and address her emotional difficulties.
Respondent mother has taken some significant steps toward stability. However, her ability to manage even her own life remains uncertain. The court finds that respondent is not in a position to provide day to day care for her children or to assume a useful role in their lives and that CT Page 8380 she has not achieved rehabilitation as would encourage the belief that she will be in such a position within a reasonable time. According to Dr. Ramos Grenier's estimate, even if respondent mother were to completely acknowledge her difficulties, she would still require at least a year of complete abstinence and stability in her life before she could be considered to be fully in the process of recovery. Because the evaluation Ramos Grenier conducted in December 2001 did not show that mother had acknowledged her substance abuse and emotional difficulties, Ramos Grenier concluded that rehabilitation would not occur in a reasonable period of time in order to establish a responsible position in the lives of the children.
In assessing rehabilitation, "[t]he critical issue is whether the parent has gained the ability to care for the particular needs of the child at issue." In re Mariah S., 61 Conn. App. at 261; accord, In reGary B., 66 Conn. App. at 292; In re Amneris P., 66 Conn. App. 377,384-85, 784 A.2d 457 (2001). The issue is not whether respondent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of Elsa and Victor.In re Shyliesh H., 56 Conn. App. 167, 180, 743 A.2d 165 (1999); In reSarah Ann K., 57 Conn. App. at 448. Elsa has severe special needs as a result of the trauma she experienced while in mother's care, and will require continued treatment and therapy. Expressing love for the children and visiting with them is vastly different from being able to care for the particular special needs of these children on a day-to-day basis. Victor, who suffers from chronic asthma requiring daily treatment, has been in foster care for all but six months of his life and Elsa has been in care for approximately half of her young life.
As Judge Brenneman stated in In re Samantha B., 45 Conn. Sup. 468,722 A.2d 300 (1997), aff'd, 51 Conn. App. 376, 721 A.2d 1255 (1998), "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe, permanent home with proven competent care-takers because her biological mother has tried hard but continues to be incapable of providing such a home for her." Here, respondent mother has tried to rehabilitate, but has done so insufficiently to be in a position to provide day to day care for either of these children within a reasonable time. Elsa and Victor now have lived much of their young lives with a loving foster family which is committed to them, and with whom they have thoroughly bonded. Although this foster home is not a preadoptive home, these children deserve an opportunity for permanency.
Thus, in its totality, the clear and convincing evidence compels the conclusion that despite some progress toward rehabilitation, respondent mother remains unable to successfully parent Elsa and Victor and lacks CT Page 8381 the ability to assume a responsible position in their lives within a reasonable time in the future. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved respondent mother's failure to achieve rehabilitation pursuant to § 17a-112 (j)(3)(B).
Petitioner also alleges that the child of Robinson C., Victor C., was found in a prior proceeding to have been neglected or uncared for, and that Robinson G. had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, he could assume a responsible position in the life of the child (C.G.S. §17a-112 (j)(3)(B)(i)). Because the court finds that both grounds of abandonment and no ongoing parent-child relationship have been established by clear and convincing evidence as to Robinson G., the court need not reach this third alleged ground as to Robinson G.
D. Act of Omission or Commission — § 17a-112 (i)(3)(C)
Petitioner alleges as to Elsa that respondent mother's parental rights should be terminated on the ground that the child had been denied, by reason of an act or acts of commission or omission, including but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for her physical, educational, moral or emotional well being. (C.G.S. 17a-112 (j) (3)(C)). The allegations under this ground are that respondent mother failed to protect Elsa from sexual molestation and that Elsa had an inadequately explained serious physical injury, i.e., a broken arm. Under the statute, non-accidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights.
Generally, the failure of a parent to protect a child from harm may, under certain circumstances, warrant the termination of parental rights. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) In re Deanna E., 61 Conn. App. 185, 193,763 A.2d 37 (2000). It is well established that the failure to protect a child from known harm over a period of time can undermine these parental obligations, most directly the expression of concern over the health and general well-being of the child and the duty to supply necessary medical CT Page 8382 care. See In re Destiny Q., Superior Court, Juvenile Matters, Child Protection Session, Docket No. U06-CP98-002230-A, at 26-28 (Nov. 19, 2001, Levin, J.) and cases cited therein. The Appellate Court has found that the failure of a parent to protect a child may give rise to the termination of parental rights. In re Antonio M., 56 Conn. App. 534,542-43, 744 A.2d 915 (2000) (act of omission or commission resulting in denial of care, guidance or control); In re Tabitha T., 51 Conn. App. 595,603, 722 A.2d 1232 (1999) (failure to protect from sexual abuse).
The Court finds that petitioner has failed to establish this ground by clear and convincing evidence. With regard to the allegation that respondent mother failed to protect Elsa from sexual molestation by an ex-boyfriend, the evidence did not establish, to a clear and convincing standard, that the child was subjected to sexual molestation and that respondent failed to protect her daughter. The physical examination was inconclusive. The physician could neither confirm nor rule out sexual molestation. No charges were ever filed. Even if the court could conclude from Elsa's conduct that she had been sexually molested at some time in her life, there was no specific evidence from which the court could determine when the molestation had occurred, who committed it, and, most importantly, whether mother failed to protect her daughter. Although mother speculated that there was a possibility that it could have occurred while mother slept and that she was unaware of it, there was simply no other evidence on this point. The possibility that mother failed to protect Elsa does not amount to clear and convincing evidence of a failure to protect. Thus the court concludes that the evidence failed to establish to a clear and convincing standard that respondent mother failed to protect Elsa from sexual abuse or molestation.
The other allegation under this ground is that Elsa had an inadequately explained serious physical injury, i.e. a broken arm. Again, the court finds that this has not been established to a clear and convincing standard. The evidence is insufficient for the court to find that the broken arm was inadequately explained. Respondent mother testified that Elsa fell from a playpen and that she took the child, on two consecutive days, to the emergency room seeking treatment. The social study states that respondent mother told hospital staff that the injury was caused due to a fall from a playpen, but that mother provided an inconsistent explanation to social worker DiVito that the child fell down the stairs. There was no testimony from the worker, or any hospital staff or records, however, as to mother's explanation of the injury. With regard to the nature of the injury, petitioner offered only the statement that the injury was most likely the result of a twist or a fall. Thus, the court is left with only the unsupported conclusion in the social study that inconsistent explanations were made to hospital staff on the one hand and DCF worker DiVito on the other. Respondent mother testified that CT Page 8383 she never gave an explanation that Elsa fell down the stairs. Since there was insufficient evidence establishing the claimed inconsistent statements, the court does not find that inconsistent explanations of the injury were given. Thus, the court finds that petitioner has not established, by clear and convincing evidence, that there was an inadequately explained serious physical injury such that this ground could be established.
E. No Ongoing Parent-child Relationship — § 17A-112(j)(3)(D):
Petitioner has alleged as to both respondent fathers that there is no-ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112 (j)(D)). This ground is established when there is no ongoing parent-child relationship with the parent, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and where allowing further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child.
No ongoing parent-child relationship contemplates "a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or [the child] has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645-46 (1980); In re John C., 56 Conn. App. 12,22, 740 A.2d 496 (1999). In any case, "the ultimate question is whether the child has no present memories or feelings for the natural parent." Inre Juvenile Appeal, (Anonymous), 177 Conn. 648, 670 (1979). The mere recognition of an individual as a parent will not defeat this ground. Inre Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984), cert. denied, 195 Conn. 801 (1985). The presence or absence of positive feelings on the part of the child is determinative. In re Shane P.,58 Conn. App. at 240.
In the adjudicatory phase, the petitioner must establish (1) that no ongoing parent-child relationship exists; and (2) that the allowance of further time for the establishment of such a relationship would harm the interests of the child. In re Jonathan C., 63 Conn. App. 516, 525
(2001). CT Page 8384
The Court finds by clear and convincing evidence that there is no ongoing parent-child relationship between the children and their respondent fathers. Respondent fathers Edwin R. and Robinson G. have never seen their children. Respondents have never sent cards, letters or gifts to or for their children or inquired about their well-being.
Certainly Elsa would not recognize Edwin R. and Victor would not recognize Robinson C. as a parent in that they would not seek comfort from their fathers or go to them to have their needs met. They have no memories of their biological fathers. Neither respondent father has ever shown any interest in their child and have rendered themselves unavailable to serve as parents. See In re Shane P., 58 Conn. App. 234,241 (2000). Respondent fathers have never met on a day to day basis the physical, emotional, moral or educational needs of these children. In reJonathan C., 63 Conn. App. 525.
The court further finds by clear and convincing evidence that to allow either respondent father further time for the establishment of a parent-child relationship with Elsa and Victor, who do not know them, would be detrimental to the best interest of the children. They have been in the same wonderful foster home together since January 2000. They are now five and three years old and suffering from the effects of having been abused and neglected.
In view of Elsa and Victor's needs, the court finds by clear and convincing evidence that it would be detrimental to them to allow any further time in which respondent fathers could attempt to develop a parent-child relationship.
Thus, the Court finds that the petitioner has proven statutory grounds for termination as to respondents Daisy C., Edwin R. and Robinson G. by clear and convincing evidence.
III. DISPOSITION
As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including March 26, 2002, the date upon which the evidence in this matter was completed.[2] With respect to the seven written factual findings required by C.G.S. § 17a-112 (k), each of which the court has considered in determining whether to terminate parental rights under this section, the court makes the following findings:
(1) As to the timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to CT Page 8385 facilitate the reunion of the child with respondent, the court finds by clear and convincing evidence that services, including visitation, were offered during the time the children were in DCF care. Further, respondents were unable to benefit from reunification efforts.
(2) As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds that reasonable efforts were made and that Daisy C., Edwin R. and Robinson G. have demonstrated that they are unable or unwilling to benefit from reunification efforts. C.G.S. §17a-112 (c)(1). The court made findings on April 5, 2001 that further efforts to reunify as to both fathers were no longer appropriate and the court found on February 6, 2002 that further efforts to reunify with mother were no longer appropriate.
(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, the court finds that specific steps were ordered as to respondents, some of which were complied with by mother and some of which were not as set forth above at pp. 14-15. Respondent fathers did not comply. DCF has fulfilled any obligations it had in order to facilitate reunification of the family.
(4) As to the feelings and emotional ties of the children with respect to their parents, any guardian, and any person who has exercised physical care, custody or control of them for at least one year and with whom they have developed significant emotional ties, the court finds by clear and convincing evidence that Elsa and Victor do not have any emotional bond whatsoever with their respondent fathers and do not know them. Neither Elsa nor Victor would recognize their father as a parent in the sense that they would not seek comfort from them or go to them to have their needs met. They have no memories of respondent fathers and do not speak of them at all.
Both children have an emotional bond with their mother who has consistently visited with them, bringing snacks and toys to the visits. Despite a lengthy visitation history, Victor's attachment to his mother appeared quite weak according to Dr. Ramos Grenier. Elsa, removed from her mother's care 2 1/2 years ago, does recognize and enjoy her mother's company during visitation, but she does not appear strongly attached, she does not have any difficulty separating from her mother and does not ask to see her. As Dr. Ramos Grenier testified credibly, Elsa does not have a relationship of trust with her mother.
Both children view their foster mother as a parental figure and have CT Page 8386 strong emotional ties to her. They have been living under her care for since January 2000. They have adjusted well to their surroundings and to their foster family. The Court finds that the foster mother is providing the physical, emotional and educational support Elsa and Victor need.
(5) As to the ages of the children, the court finds that Elsa is now 5 years of age; and Victor is 3. The Court further finds, as shown by clear and convincing evidence, that these children require stability of placement and continuity of care and that the children's attorney recommends termination.[3]
(6) As to the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; the court finds by clear and convincing evidence that respondent fathers have not attempted to establish any contact with the children. Neither respondent father has made any effort to adjust their circumstances, conduct or conditions to make it in the best interest of their child to be placed in their care. Neither has inquired about his child's well being or shown any interest in his child. Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C., 210 Conn. 157 (1989); In reJuvenile Appeal, 183 Conn. 11, 15 (1981). Respondent mother, however, has maintained contact with the children, by regularly attending visitation. She has obtained somewhat stable housing by moving in with Juan M.
(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds no unreasonable conduct by the child protection agency, or foster parent. With regard to respondent fathers, no unreasonable act or conduct of mother prevented either father from having a meaningful relationship with his child. Further, economic factors did not prevent regular, continuing contact with the children.
With respect to the best interests of the child contemplated by C.G.S. § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of Daisy C., Edwin R. and Robinson G. is in the best interest of CT Page 8387 the children. These findings are made after considering the totality of circumstances including the children's sense of time and the children's need for a secure and permanent environment. Elsa and Victor have been in DCF care for much of their young lives. When they were not in care, they suffered from severe neglect and abuse and were permitted to live under horrendous and unsafe conditions. Permanency, consistency and stability are crucial for Elsa and Victor. While respondent mother loves her children and desires to care for them, she has been consistently unable to assume a responsible parental role. According to Dr. Ramos Grenier, respondent is not in a position to parent either or both of these two children given their complex problems and special needs in view of her inability to address her own substance abuse and emotional difficulties. Even though respondent mother has taken some significant steps in her ability to manage her own life, she is not in a position to provide day to day care for Elsa and Victor. The Court again acknowledges the quality of care that they are receiving in their foster home which is able to address all of their routine and specialized needs and their attachment to the foster family.
It is accordingly, ORDERED that the parental rights of Daisy C. and Edwin R. are hereby terminated as to the child Elsa and that the parental rights of Daisy C. and Robinson C. are hereby terminated as to the child Victor. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent of Elsa and Victor for the purpose of securing an adoptive family or other permanent placement for the children.
A permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court as required by law.
Judgment may enter accordingly.
It is so ordered this 11th day of July, 2002.
 ___________________ Jongbloed, J.